## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | |
|---|---|
| DENNIS HOGUE, | |
| Plaintiff, | |
| v. | Case No. 3:19-cv-50151 |
| JOHN VARGA, ILLINOIS DEPARTMENT OF CORRECTIONS, WEXFORD HEALTH SOURCES, INC., DR. MERRILL ZAHTZ, SUSAN TUELL, AND DOE NO. 1, | Honorable Iain D. Johnston |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Dennis Hogue, now on parole, was an inmate at Dixon Correctional Center (DCC) in Dixon, Illinois. Hogue is legally blind, has chronic arthritis, and has had both hips and one knee replaced. He brings suit under 42 U.S.C. § 1983, the Americans with Disabilities Act, and the Rehabilitation Act. Hogue's constitutional claims name all Defendants except the Illinois Department of Corrections (IDOC), and his statutory claims are exclusive to IDOC.

### I. Background

Dennis Hogue was incarcerated at DCC from January 29, 2018, until October 10, 2019.[1] Dkt. 39, ¶¶ 1, 18. He is legally blind, had previously underwent a double hip replacement and a left knee replacement, and suffered from hepatitis C, schizoaffective disorder, asthma, and chronic arthritis. *Id.* ¶ 19. Among other

---

[1] The facts are taken from Hogue's second-amended complaint. Dkt. 39.

difficulties, Hogue has trouble walking. *Id.* ¶ 35. On arrival at DCC, he was given a permit that purported to prevent him from being placed in a housing unit with a high gallery or requiring him to sleep on a high bunk. *Id.* ¶ 20. Hogue was first placed in Housing Unit 44. But that unit is about a mile from both the dining facility and the church. *Id.* ¶¶ 21–22.

Around October 30, 2018, ten months after he arrived at DCC, Dr. Zahtz examined Hogue but did not recommend a housing change. *Id.* ¶ 23. Hogue often had a hard time walking well enough to keep up with the other inmates. He alleges that even in line at the dining facility, he "would often fall and have to crawl to keep up." *Id.* ¶ 24. In response, a currently unnamed correctional officer (hereinafter referred to as "Officer Doe") harassed and humiliated Hogue and "told him to keep up with the line or he could go to solitary confinement." *Id.* He explained his conditions to Officer Doe and requested his meals be delivered to his cell, but the request was denied. *Id.* ¶ 25. Hogue further alleges that, as a result of these difficulties, he missed between ten and fifteen meals because he was unable to get to the dining facility. *Id.*

Around December 9, 2018, Hogue fell when in line returning from church services. *Id.* ¶ 26. He injured his knees and right check and so he went to the medical clinic. *Id.* There, Nurse Tuell reviewed and signed his injury report, but did not recommend that Hogue be moved to a closer housing unit. *Id.* About a month and a half later, on January 25, 2019, Hogue returned to the medical clinic and requested he be given his three meals a day in his cell because of his medical

conditions and his frequent falls. *Id.* ¶ 27. He explained these difficulties to Dr. Zahtz and Nurse Tuell, but was told that he would have to speak with Warden Varga. *Id.* ¶ 28. He then spoke to Officer Doe and requested a closer housing unit. Officer Doe responded that Hogue could be moved to Housing Unit 66—which was closer but had stairs—or he could be placed in solitary confinement. *Id.* ¶ 29.

Hogue alleges that he was never offered the option of moving to the housing unit for disabled inmates, but that such a housing unit does exist. *Id.* ¶ 30. Instead, Hogue contends that he was forced to move to Housing Unit 66 in February 2019, and that the order for him to move there "came from the top." Hogue inferred, reasonably so, that this meant the order came from Warden Varga. *Id.* ¶ 31.

Just as Officer Doe had warned, Housing Unit 66 had a stairwell. When Hogue traveled to or from his cell, he had to use the stairwell, which was made more difficult because of Hogue's conditions and a loose railing. *Id.* ¶ 35. Hogue then complained about the difficult living arrangements to several corrections officers and directly to Warden Varga. *Id.* ¶¶ 36, 38. Varga responded by giving Hogue a care package of soap and deodorant and a promise that he would take care of it. Hogue believed this to mean that the warden would transfer him to a first-floor cell, but that did not happen soon enough. *Id.* ¶ 38. Hogue slipped and fell frontward down the cement stairs on February 1, 2019, flipping several times.[2] As a

---

[2] The alleged dates in the complaint are somewhat confusing. Hogue alleges both that he moved to Housing Unit 66 around February 2019 and also fell down the stairs in that unit on February 1, 2019, which implies that he either moved to Housing Unit 66 before February 2019, or that he fell on the first day of his stay there.

result, he lost consciousness. *Id.* ¶ 39. The fall caused Hogue to suffer neck and back pain, swelling of the hip, and face scratches. *Id.* ¶ 40.

As a result of these injuries, Hogue participated in physical therapy twice a week for two months. He also received electrotherapy. He was also treated with a topical menthol ointment for his hip, back massages, and a neck brace. *Id.* ¶ 42. He continues to suffer pain and physical limitations because of the fall and is currently in a nursing and rehabilitation facility because of these injuries. *Id.* ¶ 43.

In March 2019, Hogue was transferred to Housing Unit 38, where he was assigned his own room, without the need for a stairwell. While living in Housing Unit 38, Hogue also received his meals by delivery. *Id.* ¶ 47. That same month, he visited the medical clinic complaining of several falls in the prior several weeks and of neck pain—though the complaint does not make clear where these falls took place or whether the falls were before or after his transfer to Housing Unit 38. *Id.* ¶ 48. About a week later, he returned to the medical clinic to ask about switching to a soft neck brace. That report was signed by Nurse Tuell and notes that Dr. Zahtz reviewed Hogue's x-ray. *Id.* ¶ 49.

Hogue alleges that in April 2019, the prison stopped treating his medical conditions after they were notified of his lawsuit,[3] although he does not allege what treatment he sought during this time and what was denied. *Id.* ¶ 50. He also

---

[3] The Court is unsure what "lawsuit" Plaintiff is mentioning. Obviously, that "lawsuit" cannot be this action because the space-time continuum does not work that way. *See* Dkt. 1 (original complaint filed on July 8, 2019).

concludes that the prison's denials of reasonable accommodations for his medical issues and disabilities were pursuant to a policy, practice, or custom. *Id.* ¶ 54.

On June 29, 2020, Warden Varga filed a motion to dismiss Hogue's second-amended complaint. Dkt. 61. Defendants Wexford Health Sources, Nurse Tuell, and Dr. Zahtz filed a separate motion to dismiss four days later. Dkt. 63. Neither Officer Doe nor the Illinois Department of Corrections have filed motions to dismiss.

## II. Analysis

To defeat a motion to dismiss, the plaintiff must have alleged facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This means that a plaintiff's well-pleaded factual allegations must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 566 U.S. 622, 678 (2009). The Court accepts as true all of the plaintiff's well-pleaded allegations and views them in the light most favorable to the plaintiff. *Landmark Am. Ins. Co. v. Deerfield Constr., Inc.*, 933 F.3d 806, 809 (7th Cir. 2019). Furthermore, "[o]n a motion to dismiss, defendants have the burden of demonstrating the legal insufficiency of the complaint – not the plaintiffs or the court." *Reyes v. City of Chicago*, 585 F. Supp. 2d 1010, 1017 (N.D. Ill. 2008).

### A. Motion to Dismiss by Warden John Varga

Hogue sues Warden John Varga in both his official and personal capacities. Dkt. 39, ¶ 6. Varga moves to dismiss Hogue's claims against him in both capacities.

### 1. Official Capacity

The Eleventh Amendment forecloses any claim against a state official in their official capacity for money damages. *Graham*, 473 U.S. at 169. Furthermore, state officials being sued in their official capacity for money damages are not considered persons under § 1983. *See Arizonans for Official English v. Arizona*, 520 U.S. 43, 69 n.24 (1997). Instead, those claims must seek injunctive relief. But Hogue only sues Warden Varga for monetary relief. And because Hogue is no longer an inmate at Dixon Correctional Center, any prayer for injunctive would be moot regardless. *Daugherty v. McClusky*, No. 3:18-cv-50088, 2021 U.S. Dist. LEXIS 46358, at *9–10 (N.D. Ill. Mar. 12, 2021). Therefore, Hogue's official capacity claims against Warden Varga are dismissed with prejudice.

### 2. Personal Capacity

Hogue brings two distinct claims of Eighth Amendment violations. Count I applies to his incarceration from January 2018 through March 2019. Dkt. 39, at 10. Count II applies to his incarceration from April 2019 through October 2019. *Id.* at 12. Again, Hogue was allegedly transferred to Housing Unit 38—where he had meals delivered and did not have to use a stairwell—in March 2019. So, Count I concerns his time before being transferred to the better housing unit, and Count II covers the time after. Still, Warden Varga's motion to dismiss fails to recognize that Hogue has brought two claims of Eighth Amendment violations. Specifically, Warden Varga confines his argument to the time period when Hogue was living in

6

Housing Units 44 and 66. Therefore, if Varga intended to move for dismissal as to Count II, that motion is denied for failure to develop the argument.[4]

Warden Varga argues that Hogue has not alleged enough personal involvement on the part of Warden Varga or a sufficiently culpable state of mind. Dkt. 61, at 5. Specifically, he argues that Hogue did not allege that he had any personal involvement with Hogue's placement in Housing Unit 44 and that Hogue's allegation that Varga ordered Hogue's transfer to Housing Unit 66 is "without any basis or support." *Id.* at 6. Furthermore, Warden Varga argues that Hogue's allegations that he complained to Varga about his blindness and difficulty walking up and down the stairs and that Varga took no action are insufficient: "Plaintiff never alleges how he 'complained' to Varga or how he allegedly made Varga aware of his situation. More important, Plaintiff never alleges that he interacted with Varga." *Id.* at 7. This is a weak argument.

Additionally, Warden Varga contends that Hogue's allegations amount to Varga being aware of Hogue's circumstances and that such allegations do not

---

[4] The Court recognizes that paragraphs 74 through 77 of Hogue's complaint—which are within the section for Count II—are confusing. They allege facts that occurred before the time period in question. Thus, they have no relevance to Count II, which is specifically related to the purported failure to continue treating Hogue's medical conditions. Still, the Court will not consider an argument when the movant has not clearly included it in the motion to dismiss. "[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues)." *Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016) (quoting *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991)). Varga does, however, argue in reply for dismissal of Count II. But arguments raised for the first time in reply are waived. *United States v. Waldrip*, 859 F.3d 446, 450 n.2 (7th Cir. 2017). That is also true of Warden Varga's argument that Hogue conflates the need to provide him disability accommodations with deliberate indifference to a serious medical condition. That argument appears no where in the brief in chief.

amount to facilitating, condoning, or turning a blind eye—such that Varga was deliberately indifferent. Effectively, Varga argues that Hogue seeks to hold him responsible under a theory of respondeat superior instead of for his personal involvement. *Id.*

For Eighth Amendment claims, Courts determine whether the defendant acted with deliberate indifference to a serious medical condition. *Perry v. Sims*, No. 19-1497, 2021 U.S. App. LEXIS 6165, at *8–9 (7th Cir. Mar. 3, 2021). "Liability arises only where an official has knowledge of a substantial risk of harm stemming from a serious medical condition and fails to take reasonable measures to mitigate the risk." *Id.* Still, deliberate indifference requires that plaintiffs allege conduct that amounts to more than mere negligence. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). Instead, "deliberate indifference [lies] somewhere between the poles of negligence at one end and purpose or knowledge at the other." *Id.* at 836.

As the Seventh Circuit has explained, deliberate indifference is a subjective standard. "To demonstrate deliberate indifference, a plaintiff must show that the defendant 'acted with a sufficiently culpable state of mind,' something akin to recklessness." *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011) (quoting *Johnson v. Snyder*, 444 F.3d 579, 585 (7th Cir. 2006)). Critically, plaintiffs must allege how each defendant in an individual capacity suit was involved in the alleged constitutional violation. *Minix v. Canarecci*, 597 F.3d. 824, 833 (7th Cir. 2010).

The allegation that Warden Varga was personally involved in Hogue's reassignment to Housing Unit 66 is enough to state a claim for deliberate

indifference. First, Hogue alleges that the prison had a housing unit tailored to meet the needs of its disabled inmates. *Id.* ¶ 30. Second, Hogue alleges that the medical unit gave him a permit to be housed in a unit without a high gallery or a high bunk because of his serious medical conditions. *Id.* ¶ 20. Finally, Hogue alleges that Warden Varga was personally involved in his being assigned to a unit that did not meet these requirements. *Id.* ¶ 31. This is enough to imply that Warden Varga knew about Hogue's conditions and assigned him to an ill-suited housing unit anyway—contrary to the permit issued by the medical staff.

Warden Varga argues the assertion that he ordered the move is without support. But that assertion is based on a correctional officer telling Hogue that the order "came from the top," which Hogue interpreted as Warden Varga. *Id.* On a motion to dismiss, the Court accepts all reasonable inferences in Hogue's favor. This inference is easily reasonable, and it is enough to defeat Varga's motion. These allegations, read in their totality and taken as true, create the reasonable inference that Warden Varga is liable for violating Hogue's rights under the Eighth Amendment. The allegations may not be proven true, but they are enough to entitle Hogue to discovery.

**B. Motion to Dismiss by Dr. Zahtz, Nurse Tuell, and Wexford Health Sources**

In a separate motion, Defendants Dr. Zahtz, Nurse Tuell, and Wexford Health Sources move to dismiss Counts I and II. Dkt. 63. In it, they argue that Hogue's allegations are conclusory and do not raise an inference of liability.

9

To reiterate, Hogue must allege facts that show how each defendant was personally involved in the alleged Eighth Amendment violation. *Minix v. Canarecci*, 597 F.3d. 824, 833 (7th Cir. 2010). And he must allege facts that show each defendant was deliberately indifferent to his serious medical conditions; a higher bar than negligence. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994).

### 1. Dr. Zahtz and Nurse Practitioner Tuell

The allegations in Count I fail to state a claim against Dr. Zahtz or N.P. Tuell. This claim covers the period from Hogue's incarceration until about the time he was transferred to Housing Unit 38, which appears to have met his needs. Hogue alleges that he was given a permit from the medical clinic when he arrived at DCC that recommended he be housed in a unit with a low gallery and a low bunk. So, at least on entry, the medical staff was trying to accommodate his needs.

Hogue then alleges that he visited Dr. Zahtz on October 30, 2018, that Dr. Zahtz was aware of his conditions, but that he took no action to place Hogue in a better housing unit. Dkt. 39, ¶ 23. Hogue alleges that he visited the medical clinic again on January 25, 2019, spoke to both N.P. Tuell and Dr. Zahtz, and requested meal delivery because of his conditions. *Id.* ¶ 28. During these visits, he explained the difficulties he was experiencing and was told by Nurse Tuell and Dr. Zahtz that he would have to speak with Warden Varga. *Id.* 28. Nothing in his allegations, taken as true, show that any medical staff had any authority over housing issues other than to issue a permit recommending accommodations; a permit that was

issued. These are the only allegations relevant to Hogue's Count I claim against Dr. Zahtz and N.P. Tuell, and they do not reach the level of deliberate indifference.[5]

Count II of Hogue's Eighth Amendment claims against Dr. Zahtz and N.P. Tuell focuses on Hogue's time after being transferred to the better housing unit. In what appears to be an alleged retaliation for filing the present lawsuit, Hogue alleges that they, along with the other Defendants, stopped providing him with medical care. *Id.* ¶ 78. That is it. If that is true, then it is troubling. *Williams v. Kasper*, 599 F.3d 791 (7th Cir. 2010). But that conclusory allegation is not enough to state a claim. Hogue does not allege that he requested medical care or that he even visited the medical clinic. This is not enough to raise a plausible inference that Dr. Zahtz or N.P. Tuell manifested deliberate indifference to Hogue's serious conditions.

Because Hogue has failed to state a claim against Dr. Zahtz and N.P. Tuell, both Counts I and II against them are dismissed without prejudice.

### 2. Wexford Health Sources

Hogue also sues Wexford Health Sources under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Liability under *Monell* exists only "when execution of a government's policy or custom, whether made by its law-makers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005) (quoting *Monell*, 436 U.S. at 694 (1987)).

---

[5] Hogue also alleges that he visited the medical clinic around March 28, 2019, and asked about switching from a hard neck collar to a soft one and that Dr. Zahtz reviewed his x-ray. Dkt. 23, ¶ 49. He does not allege that he was denied the opportunity to make the switch. The Court is unaware how this allegation is relevant to his claims.

11

Under *Monell*, liability may lie in three circumstances: (1) the defendant employs an express policy that causes the constitutional injury, (2) the defendant has established a widespread practice that is so well settled that it constitutes a custom or usage, or (3) the defendant has final policymaking authority and has caused the constitutional injury. *McCormick v. City of Chi.*, 230 F.3d 319, 324 (7th Cir. 2000). Furthermore, the allege policy or practice must be the "direct cause or moving force behind the constitutional violation." *Woodward v. Corr. Med. Servs.*, 368 F.3d 917, 927 (7th Cir. 2004). Although plaintiffs must plead enough facts to make their claim plausible, such that it raises the inference of liability, the Supreme Court has clearly held "that federal courts must not apply a heightened pleading standard" to *Monell* claims. *McCormick*, 230 F.3d at 323.

Here, Hogue's complaint falls well short of alleging a plausible claim under *Monell*. He alleges that "[p]ursuant to a policy, pervasive practice, or custom at Dixon and Wexford, Defendants denied Mr. Hogue reasonable disability accommodations, such as accessible housing, walking assistance, and food delivery, to accommodate his legally blind status and other serious conditions." Dkt. 39, ¶ 54. He also alleges that N.P. Tuell and Dr. Zahtz were operating under the policies and customs of Wexford. *Id.* ¶ 62. Nothing in these allegations explains what the purported policy, practice, or custom is.

If anything, Hogue's complaint shows that a policy existed to issue permits to qualifying inmates to be placed in housing suitable to their needs. After all, he alleges that he received such a permit. That the prison itself did not follow the

12

recommendations of its medical provider does not show a policy on the part on the part of that medical provider. Therefore, Hogue's claims against Wexford Health Sources are dismissed without prejudice.

## III. Conclusion

For the reasons explained above, Warden Varga's motion to dismiss Hogue's complaint [61] is granted as to the official capacity claims and denied as to the individual capacity claims. The consolidated motion to dismiss Hogue's claims against N.P. Tuell, Dr. Zahtz, and Wexford Health Sources [63] is granted. The dismissal of Hogue's complaint against Warden Varga in his official capacity is with prejudice. The remaining dismissals are without prejudice. Hogue has until April 7, 2021 to file an amended complaint.

Date: March 17, 2021

Honorable Iain D. Johnston
United States District Judge
Northern District of Illinois
Western Division

13